MOHAWK MOTOR, INC., APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 40464—Decided July 26, 1967.)

Mr. *Taylor C. Burneson*, for appellant.

Mr. *William B. Saxbe*, attorney general, Mr. *J. Philip Redick* and Mr. *Langdon D. Bell*, for appellees.

HERBERT, J. The transcript of the testimony, the exhibits, and briefs of counsel present a rather voluminous collection of documents. It is not the purpose of this opinion to weigh the evidence or to substitute the judgment of this court for that of the commission on factual matters but rather to determine from

the entire record if the findings and order of the commission are reasonable and lawful.

Appellant contends that the report of the examiner (made a part of the findings and order of the commission) discloses grievous error in certain of its conclusions drawn from the evidence. The following is quoted from the commission's opinion:

"* * * The witness identified protestants exhibit E as being a list of the tonnage from and to Bryan, Ohio for the year 1964 and the first three months of 1965. During this period, the protestant transported a total of 5,023,052 *tons* out-bound and 4,872,592 *tons* inbound." (Emphasis added.)

An examination of the record discloses that the witness was using figures referring to *pounds* not tons.

In brief, the commission concluded that Mohawk carried two thousand times more property by weight than it actually did through the period in question. The amount of traffic is vital in determining the presence or absence of public convenience and necessity. By reason of this grievous mistake, the findings and order of the commission fail to reflect faithfully the true image of the evidentiary structure of this case.

Appellant contends further that the application for the certificate of public convenience and necessity fails to comply with the provisions of Section 4921.08 of the Revised Code. In its pertinent parts the statute provides that:

"The Public Utilities Commission shall adopt rules prescribing the manner and form in which motor transportation companies shall apply for a certificate of public convenience and necessity, among which shall be a rule that applications shall be made in writing on the blanks furnished by the commission and shall:

"* * *

"(F) contain the proposed tariff schedule showing the rates to be charged if operating or proposing to operate motor vehicles over an irregular route."

The facts underlying this contention are not in dispute. In its application for a certificate, Duff stated that it was a party to the Ohio Carriers Tariff Service and that Duff's rates were published by that agency. This statement, according to

the record, was incorrect in that Duff ceased to be a participant in this tariff agency in 1964.

In the testimony of John E. Scott, director of traffic for Duff, is found the following:

"Q. Mr. Scott, this application was filed January 22, 1965. In exhibit 5 of the application it is stated that your company is a party to the Ohio Carriers Tariff Service, a rate publishing agency, that the rates which you propose to charge, that the Duff Truck Lines, Inc., proposes to charge, if it receives the certificate for which it makes application, are the rates published in that tariff?

"Now, the question: Is that correct or incorrect? A. I would have to see the exhibit you speak of.

"Mr. Burneson [attorney for Mohawk] All right, I will ask the examiner to let me have the official application as filed with this commission. I now place it before you.

"The witness: The particular rate publishing bureau we are now a participant in is the Ohio Motor Freight Tariff Committee.

"Q. (By Burneson) I asked you for a direct answer. Is the statement contained in exhibit 5 correct or incorrect? A. It is incorrect.

"* * *

"Q. (By Burneson) Your application states that your company proposes to charge the rates published in the tariff of the Ohio Carriers Tariff Service. Is that statement correct? A. That statement is not correct.

"Q. You said that your company now participates in some other tariff. Will you identify that tariff publication again, please? A. Yes, sir. Ohio Motor Freight Committee, Incorporated.

"Q. Is your company a participating carrier in that tariff? A. Yes, sir.

"Q. Was your company a participating carrier in that tariff as of January 22, 1965? A. Yes, sir."

It follows that the rate schedule used by Duff was not on file nor was there any schedule of proposed charges on file in this cause.

The rules of the commission provide under the heading "3.02 Procedure on Application:

"(A) No application will be accepted for filing unless it is complete in every particular, including the filing of all required exhibits in proper forms.

"* * *

"(E) All exhibits must conform to the requirements set forth in Section 3.03.

"(F) One copy of each exhibit must be made available for the record, one for the attorney-examiner and one for each opposing party."   . . .

There was no exhibit of the rate schedule for service upon the opposing party or providing one for the examiner.

Each application should be complete as required by the statute, Section 4921.08 of the Revised Code, and the rules of the Public Utilities Commission. We recognize that rate schedules are sometimes quite voluminous and cumbersome to handle. This obstacle could have been very well overcome had reference been made in the record to the real tariff publishing agency and its rates could have been by reference made a part of the record. This would have enabled any interested person or party to locate any record pertinent to the matter before the commission.

This becomes more significant by reason of the disclosure in the testimony of Charles Spangler, a witness for Duff, that there was a change in the rates by Duff when it ceased to participate in the Ohio Carriers Tariff Service and became a party to Ohio Motor Freight Tariff Committee in 1964, as follows:

"Q. Mr. Spangler, what rate is Duff giving you on the 1,750,000 pounds that you shipped with them in 1964? What tariff did they use? A. There is a new tariff that went in in 1964. I can't tell you when. I don't know the number of the tariff. But, it is a commodity rate from Bryan to these points.

"Q. Well, let me ask you this: What was the—did that rate change any from that time? A. There was a lower rate than the previous class rates that we were using.

"Q. Sometime in 1964, when they changed the tariff, you got a different rate, is that right? A. Yes, sir."

The record clearly establishes that the application for the certificate does not comply with the provisions of Section

4921.08 of the Revised Code or with the rules of the commission relative to material information required to be given in the application..

The commission cites the case of *Railway Express Agency, Inc.,* v. *Public Utilities Commission,* 123 Ohio St. 159, to support its position. On the contrary, *Railway Express* tends to support the contention of the appellant that the application should comply with mandatory provisions of the statutes and rules. The court spoke through an opinion *per curiam.* At the foot of page 163, the court said:

"In regard to the tariff schedules filed, this record is somewhat indefinite. It is sufficient to state that the plaintiff in error, as a common carrier of intrastate shipments, like any other motor company, *is required to file definite tariff schedules between the points of origin and destination which are within the state.* If that has not been done, *the commission may still require their filing under the provisions of Section 614-90 et seq., General Code.''* (Emphasis added.)

The present statute, Section 4921.09 of the Revised Code, provides in part:

"* * * The commission may permit the correction, amendment, modification, or alteration of any such application *at or before the hearing* on it when, in its opinion, the application and notice are in substantial compliance with the law. Otherwise, it shall direct the filing of a new application or the giving of a new notice, or both.'' (Emphasis added.)

In the case at bar, the protestants, at the commencement of the hearing before the commission, made vigorous objections to the defects in the application. These objections were overruled. Neither the examiner nor the commission suggested or required amendment or alteration of the application to provide a schedule of rates or charges to be made by the applicant in the event that it should be granted a certificate.

In view of the specific and mandatory language, both in the statute and in the rules of the commission relative to information that must be given in the application for a certificate, it appears that there should have been some amendment to the application setting out rates and charges to be made in the event that the application should be granted.

Strict adherence should be given to those provisions of the statute requiring specific information to be provided in the application for certification. See *Zanesville-Columbus Red Star Co.* v. *Public Utilities Comm.* (1932), 125 Ohio St. 470; *Erie Rd. Co.* v. *Public Utilities Comm.* (1927), 116 Ohio St. 710; *Lakeshore Electric Ry. Co.* v. *Public Utilities Comm.* (1926), 115 Ohio St. 311; *New York Central Rd. Co.* v. *Public Utilities Comm.,* 123 Ohio St. 371; *Specialized Transport, Inc.,* v. *Public Utilities Comm.* (1960), 170 Ohio St. 539; and *Central Ohio Transit Co.* v. *Public Utilities Comm.* (1929), 119 Ohio St. 531.

The materiality and relevancy of the testimony of the plant superintendent of the Holabird Company are doubtful. In the examiner's review of this shipper's testimony it is stated:

"* * * The shipper's [Holabird] difficulties stem primarily from *freight embargoes placed on the transportation of furniture.* * * *"

These embargoes were imposed by two or three large carriers who would not accept freight unless it originated on their lines. The appellant was not in any way responsible for these embargoes. The appellant—in spite of the embargoes—did provide carrier service to Holabird. It is significant that, at the commencement of the hearing, Duff amended its application to restrict the authority applied for against "transportation of household goods, furnishings and fixtures * * *."

Holabird manufactures these same commodities. It follows that, if the certificate is granted to Duff, it will not be of any value or service to Holabird because Duff would not, under its certificate, be permitted to transport that shipper's products.

It is quite apparent that Holabird was not aware of the restriction upon the authority sought by Duff or that Duff would not handle its property. Holabird's misconception is revealed in the testimony as reviewed by the examiner:

"The witness (Holabird's plant manager) further stated that the service proposed by the applicant, namely single line service, would save his company a considerable amount of money."

Holabird's testimony was neither material nor relevant to the issues before the commission. It seems reasonable to infer that Duff did not want Holabird's business, restricted as it was by embargoes, hence amended its application to restrict its

authority specifically against furniture and household effects—precisely the type of commodity manufactured by Holabird.

There does not appear to be any public convenience and necessity demanding additional *regular route service*. The shipments of less-than-truckload lots create the problem. Public convenience and necessity can only be ascertained by compliance with the statutes and the rules of the Public Utilities Commission.

Consequently it is necessary that we look at the record in its entirety to determine if the order of the commission is unreasonable or unlawful.

It cannot be said that the application as presented to and considered by the commission complied with the statutes and rules of the commission. When the commission determined that the weight of the traffic carried by Mohawk over a 15-month period was two thousand times more than it actually was, serious error was committed. The amount of traffic is an important factor in determining whether there is a public convenience and necessity. A miscalculation such as the record here discloses would tend to affect the thinking of the commission in its finding that there was a deficiency in motor transportation facilities.

Furthermore, there was the incident where Duff circulated certain letters among shippers in Bryan, tending to mislead them to the prejudice of Mohawk and thus failure to advise Holabird that granting the authority sought by Duff would not in any way benefit Holabird.

In 1962—five years ago—the Superior Cartage Company, Inc., made application for a certificate of authority but such application is still pending. It would appear to be quite logical that if there is any public convenience and necessity existing today an application to relieve such a situation would not be allowed to pend for so many years.

A consideration of the entire record leads to the conclusion that the order of the commission is unreasonable and unlawful, and its order is, therefore, reversed.

*Order reversed.*

TAFT, C. J., ZIMMERMAN, MATTHIAS, O'NEILL, SCHNEIDER and BROWN, JJ., concur.